FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA** `01 APR -2 PM 2: 32`
**TAMPA DIVISION**

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

BATES SHOW SALES STAFF, INC.
d/b/a BATES RVee EXCHANGE, a
Florida corporation,

     **Plaintiff,**        Case No. **8:00-cv-322-T-27TBM**

**v.**

**GULF STREAM COACH, INC.,**
a foreign corporation,

     **Defendant.**
_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT AS TO COUNT II AND**
**MEMORANDUM OF LAW IN SUPPORT**

   Plaintiff, BATES SHOW SALES STAFF, INC. (hereinafter "Bates RVee"), by and through

its undersigned counsel, hereby files its Response to Defendant GULF STREAM COACH, INC.'s

(hereinafter "Defendant") Motion for Summary Judgment as to Count II of Plaintiff's Complaint.

Defendant has failed to establish the absence of any genuine issue of material fact relating to Count

II, and therefore Summary Judgment is inappropriate. In support of this Response, and as evidence

of Defendant's failure, Bates RVee states the following:

   1.  Bates RVee filed its Complaint on January 27, 2000 in the Circuit Court for the

Thirteenth Judicial Circuit of the State of Florida. The Complaint alleged two counts: Breach of

Contract and Tortious Interference with an Advantageous Business Relationship. Defendant timely

removed the case to this Court on February 15, 2000.

   2.  Following an extended period of discovery, Defendant has filed its Motion for

Summary Judgment as to Count II (hereinafter "Motion") of Bates RVee's Complaint. Defendant's

*56*

Motion argues that summary judgment is proper in regards to the Tortious Interference with an Advantageous Business Relationship (hereinafter "TIABR") claim, because (1) Bates RVee has failed to place facts in evidence regarding the claim, (see Defendant's Motion, p.6); (2) Defendant is an interested party to the business relationship and therefore cannot have tortiously interfered with it, (see id. at 8); (3) Bates RVee has failed to state a claim for TIABR, (see id. at 11); and (4) that any evidence that Bates RVee might use to establish its TIABR claim is privileged under Florida law, (see id. at 12).

3.     Defendant's Motion is without merit because: (1) Bates RVee, through the deposition of its Owner, Frank Bates, has introduced sufficient specific, probative, and uncontroverted evidence demonstrating the existence of triable issues of fact; (2) Defendant is not now, and never was, an interested party to the independent business relationship between Bates RVee and its floor-plan providers; (3) Bates has, in fact, stated a claim for TIABR; and (4) any privilege that Defendant may have had in its communications with the floor-plan providers was waived when Defendant acted with malice.

4.     Because Bates RVee has appropriately pled its TIABR claim, and because Defendant has failed to establish the absence of any genuine issues of material fact, Defendant's Motion should be denied, and Bates RVee's TIABR claim should be allowed to proceed.

In support of this Response, Bates RVee submits the following Memorandum of Law:

## MEMORANDUM OF LAW IN SUPPORT OF BATES RVEE'S RESPONSE

### I. Summary Judgment Standard

Defendant is entitled to summary judgment if it can show that Bates RVee cannot produce sufficient evidence to establish an essential element of its case in which it bears the burden of proof

at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Defendant, as the moving party, bears the initial burden of directing this Court to that part of the record, viewed in a light most favorable to Plaintiff, which shows the absence of a genuine issue of material fact. See id. If Defendant meets its burden, Bates RVee, to prevent summary judgment, must then establish that a genuine dispute of material fact does exist. See Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913 (11th Cir. 1993).

Here, Defendant has failed to meet the initial burden required of it by the Celotex case, thus making summary judgment inappropriate. Defendant is simply wrong in its assertion that there are no facts in evidence regarding the TIABR claim; the facts do exist, Defendant has simply chosen not to address them. Furthermore, even if the Defendant has met its initial burden, Bates RVee can demonstrate the existence of genuine issues of material fact that, if believed by a reasonable fact-finder, would lead to a favorable verdict for Bates RVee on its TIABR claim.

## II. Defendant has Failed to Meet Its Burden as Moving Party

Here, Defendant has failed to meet the initial burden required of it by the Celotex case. Defendant relies wholly upon two sources as a basis for its claim that no genuine issues of material fact exist in this case: Bates RVee's Complaint and Bates RVee's Answers to Interrogatories (attached to Defendant's Motion as Exhibit A). Defendant offers no deposition testimony to support its Motion, nor does it offer any sworn affidavits.[1] Based solely upon the Complaint and the

---

[1] Defendant may argue that at the time it was required to submit its Motion pursuant to this Court's Scheduling Order, no depositions had yet been taken. This is true; however, this argument ignores the fact that Defendant chose to wait - apparently as a tactical decision - until nearly the close of a court-extended discovery period to attempt to set any depositions or conduct any meaningful discovery. (See Defendant's Notice of Propounding Interrogatories upon Plaintiff and Defendant's Request to Produce to Plaintiff, attached hereto as Composite Exhibit 3, and Defendant's Notice (and

Interrogatory Answers, Defendant suggests that Bates RVee has failed to offer any evidence in support of its TIABR claim. (See Defendant's Motion, pp. 4-8).

Contrary to Defendant's position in its Motion, Bates RVee has established sufficient evidence in the record to raise genuine issues of material fact supporting its TIABR claim. Bates RVee, through the deposition testimony of Frank Bates, provided extensive evidence of how Defendant tortiously interfered with the relationship it had with NationsBank and Deutsche Financial Services ("DFS").[2] (See Deposition of Frank Bates from March 2, 2001 (hereinafter referred to as "Bates Dep.") attached hereto as Exhibit 1; pp. 170-202). In addition, Bates RVee is able to offer the Affidavit of Frank Bates (hereinafter referred to at "Bates Aff.," attached hereto as Exhibit 2) as additional support for its TIABR claim.

Instead of offering affirmative evidence of its own, Defendant has chosen to rely on only a small portion of the actual evidence available in this case for support of its Motion. As a result, Defendant has failed to direct the Court to the most relevant portions (where the TIABR claim is discussed) of this case's evidentiary record, and has therefore failed to meets its burden under the summary judgment standard as set forth in the Celotex case. See Celotex, 477 U.S. at 322-23. Thus, summary judgment should be denied, and Bates RVee's case should be permitted to move forward.

---

Amended Notices) of Taking Depositions, attached hereto as Composit Exhibit 4). Furthermore, Defendant could have moved to supplement its Motion with evidence from Mr. Bates' deposition during the more than three weeks since the deposition was taken; it simply has chosen not to do so.

[2] Bates RVee, through various pleadings and other sources, has also established that it had a relationship with both floor-plan providers and that Defendant was aware of this relationship. However, as these facts are acknowledged by Defendant in its Motion, there is no need for Bates RVee to re-establish them here. (See Motion p. 4).

### III. Bates RVee Can Show Genuine Issues of Material Fact in Support of Its TIABR Claim

Even if Defendant has meet its burden under the Celotex case, Bates RVee has established, and therefore can show, that genuine issues of material fact exist concerning its TIABR claim. These facts, when viewed in the light most favorable to Bates RVee, easily support its TIABR claim against Defendant. Defendant makes four arguments in its Motion to support its request for summary judgment: (A) There are no facts in evidence to support the TIABR claim; (B) Defendant was an interested party to the claim, thus making any tortious interference impossible; (C) Bates RVee has failed to state its TIABR claim; and (D) any communications supporting Bates RVee's TIABR claim are privileged and cannot be used, thus leaving Bates RVee with no evidence to support its TIABR claim. Bates RVee will address each of Defendant's claims separately; first, however, it is necessary to show what is required to prove a TIABR claim.

*Elements of a TIABR Claim*

Under Florida law, the elements of a TIABR claim are:

1. Existence of a business relationship;
2. Knowledge of the business relationship on the part of the Defendant;
3. The intentional and unjustified interference with the relationship by the Defendant; and
4. Damage to the Plaintiff as a result of the interference or breach of that relationship.

See Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812, 814 (Fla. 1995). See also Rockledge Mall Associates, Ltd. v. Custom Fences of South Brevard, Inc., ___ So.2d ___, 2001 WL 43091 (Fla. 5th DCA 2001) at *3; North American Van Lines, Inc. v. Ferguson Transportation, Inc., 639 So.2d 32, 33 (Fla. 4th DCA 1994); Harllee v. Professional Service Industries, Inc., 619 So.2d 298, 300 (Fla. 3d DCA 1993). While similar, a TIABR claim differs from a "tortious interference with a contract" claim in that a TIABR claim does not require a contract be breached as the result of the alleged tortious interference; in fact, in some cases involving interference with a business

5

relationship, a full "breach" of the relationship is not required at all, but rather only damages associated with the interference. See William Electric Co., Inc. v. Honeywell, Inc. 772 F.Supp 1225, 1235-1236 (N.D. Fla. 1991); Wackenhut Corp. v. Maimone, 389 So.2d 656, 657 (Fla. 4th DCA 1980).[3]

### A. There are Facts in Evidence to Support Bates RVee's TIABR Claim

Defendant's first argument in support of its Motion is that Bates RVee has no evidence to offer regarding the TIABR claim. (See Motion, pp. 6-7). Aside from the fact that, when moving for summary judgment, it is Defendant's burden to establish that Bates RVee cannot produce evidence to offer supporting its TIABR claim, Defendant's first argument is simply wrong. Defendant claims that Bates RVee has not alleged any damages, not suggested any witnesses to speak to the TIABR claim, and not placed any facts into evidence that support the TIABR claim. (See id.). These claims are simply untrue.

Defendant claims that Bates RVee listed no damages in its Answers to Interrogatories due to the TIABR claim. (See id. at 6). However, Bates RVee, in its Answer to Interrogatory 4 (attached to Defendant's Motion as Exhibit A) lists specific damages relating to both DFS and NationsBank. Furthermore, when asked about damages at his deposition, Mr. Bates explained that as a result of the tortious interference by Defendant, Bates RVee suffered loss of credit and standing with NationsBank and DFS, and due to those losses, Bates RVee suffered a loss of business. (See Bates Dep., pp. 185-188). Thus, clearly, Bates RVee has introduced evidence concerning the damages

---

[3] The case Defendant cites to on page 8 of its Motion, Johnson Enterprises v. FPL Group, Inc., 162 F.3d 1290 (11th Cir. 1998), is a case that addresses tortious interference with a contract, which is not the claim that Bates RVee has brought in this case. The other case cited (but not quoted) by Defendant, Pilkington v. United Airlines, 112 F.3d 1532 (11th Cir. 1997), is in fact a TIABA case. Comparing the two cases, the elements are different between the two claims. See Johnson, 162 F3d at 1321; Pilkington, 112 F.3d at 1540.

element of the TIABR claim.

Furthermore, Defendant claims that no witnesses from either NationsBank or DFS are listed in Bates RVee's Answer to Interrogatory 2. (See Motion at 6). However, Bates RVee, in its Answer to Interrogatory 2, listed Mr. John Anderson, of DFS, as a person with knowledge of the condition of the RV units. As Mr. Bates stated in his deposition, the condition of the units, particularly the Sunsport unit, was central to the TIABR claim. (See Bates Dep., pp. 177-178). Thus, Mr. Anderson's knowledge of the condition of the units at issue in this case bares directly upon the TIABR claim. Therefore, Bates RVee has introduced evidence naming a witness from DFS regarding the TIABR claim.[4]

Finally, Defendant argues that Bates RVee has introduced no evidence whatsoever regarding the TIABR claim. (See Motion, p.7). This obviously is not the case, as the established body of evidence can show.

In its Complaint, Bates RVee alleged that (1) an advantageous business relationship existed between Bates RVee and its floor plan sources (i.e. its creditors), DFS and NationsBank; (2) that Defendant knew about this relationship; (3) that Defendant sent false and defamatory communications to the creditors with the intention of interfering with the relationship; and (4) that

---

[4] Defendant also claims that Bates RVee's stated objection to Defendant's Interrogatory #5 somehow establishes an admission on the part of Bates RVee that it has no facts to support its TIABR claim. (See Motion at 7). Bates RVee objected to Interrogatory # 5 as being vague and confusing, and because it appeared to call for information that was related to the work product of its attorneys. Defendant made absolutely no effort to clarify its Interrogatory in response to Bates RVee's objection, nor did it ever move this Court to compel an answer. Now, only after discovery has closed, Defendant has chosen not to pursue an answer for its vague and confusing question, preferring instead to use its poorly-worded question as a proxy for its lack of any meaningful evidence. Bates RVee would have (and in fact has) willingly answered any interrogatory that it could make sense of; Defendant's lack of interest in making its intent known regarding Interrogatory #5 should not now be used against Bates RVee.

as a result of the communications, Bates RVee's relationship with its creditors was damaged via "the restriction of its business." See Complaint. Defendant suggests that Bates RVee relies solely upon its pleadings to establish its TIABR claim. (See Motion at 6-7). In fact, however, Bates RVee does not rely solely upon its pleadings, but has placed additional evidence into the record supporting its claims, evidence that Defendant has failed to refute in any manner whatsoever.

Defendant, in its Motion, has admitted to the existence of a business relationship between Bates RVee and DFS/NationsBank, and has also admitted to knowing of the relationship. (See id. at 4). In addition, Bates RVee has presented facts that Defendant intentionally interfered with the business relationship by sending Bates RVee a letter (which it also copied to DFS and NationsBank) stating that a particular unit (a Sunsport RV) that was being financed by DFS had been "damaged by being dropped from a crane, and from waterfowl living in it." (See Bates Dep. pp. 178-182 and Deposition Exhibit 10 attached thereto.). The letter stated that, as a result of the damage, the unit would not be repurchased because "it cannot be restored to a saleable condition." (See Bates Dep. p. 179, Deposition Exhibit 10 attached thereto). These statements were completely untrue, as Defendant was well aware.

First, prior to Defendant sending the letter to Bates RVee and copying the floor-plan financiers on it, Defendant had inspected the vehicle and had, in fact, driven it off Bates RVee's lot to a storage facility. (See Bates Dep. pp. 75-77). Second, not only was the Sunsport RV in a saleable condition, but there was also an offer for the Sunsport RV that had been made by the owner of the storage facility where the Sunsport RV was being kept. (See Bates Aff.). Defendant knew about the offer, as it told the facility's owner to contact Bates RVee regarding the offer. (See id.).

The result of this letter, intentionally copied to DFS and NationsBank by Defendant, was that Bates RVee's reputation with its floor-plan sources was damaged, resulting in a limitation being put

8

on Bates RVee's credit. (See Bates Dep. pp. 185-188).   As a result of the limitations, Bates RVee

suffered business losses. (See id. at 186).   Therefore, there is evidence in the record concerning

every element of Bates RVee's TIABR claim, evidence that is uncontroverted by Defendant in its

Motion.   Considering this evidence in the light most favorable to Bates RVee, there is clearly

sufficient evidence to support its TIABR claim, and therefore summary judgment on Count II is

inappropriate.

>    B.    *Defendant is Not an Interested Party to Bates RVee's Business Relationship with Its*
>          *Floor Plan Financiers*

Defendant's next argument in support of its Motion is that it is an interested party to Bates

RVee's business relationship with NationsBank and DFS and, therefore, as a matter of Florida law,

it cannot tortiously interfere with that relationship.   In Florida, a cause of action for tortious

interference with a contract or business relationship does not exist against a party to the contract or

business relationship allegedly interfered with.   See Florian Greenhouse, Inc. v. KOK Construction

Inc., 1995 WL 611603, *4 (M.D. Fla. 1995) (citing Genet Company v. Anheuser-Busch Inc., 498

So.2d 683 (Fla. 3d DCA 1986)).   Defendant asserts that it is a "necessary and interested" party to

the contracts and business relationships between Bates RVee and its floor plan financiers because

"without a vehicle sold by Defendant to Plaintiff, there would be no need for floor plan financing."

(See Motion, p. 11).

Defendant's argument fails for two reasons.   First, Defendant falsely implies that Bates RVee

is an exclusive dealer of Defendant's vehicles.   To the contrary, Bates RVee has never done business

with Defendant exclusively; Defendant was only one of several manufactures with whom Bates

RVee used DFS' and NationsBank's financing. (See Bates Aff.).   Floor-plan financing is necessary

for all vehicles, regardless of whether or not Defendant is the manufacturer providing them. (See

id.). Therefore, it is crucial for Bates RVee to maintain positive business relationships with its floor-plan financiers whether or not Bates RVee does business with Defendant.  (See id.).

Second, the cases relied upon by Defendant do not support its theory that it is a party to the business relationship between Bates RVee and its floor plan financiers.  The three cases discussed by Defendant hold that when a contract (or business relationship) expressly provides that performance is subject to the approval of a third-party, or when a contract (or business relationship) expressly requires the third-party's supervision and recommendations for contract performance, the third-party is a party to the contract.  See  Hall v. Burger King Corp., 912 F.Supp. 1509, 1528-29 (S.D. Fla. 1995) ("since BKC has the contractual right to approve or disapprove the transfer of any Burger King® franchise, BKC was, by necessity, a party to any alleged agreement"); United of Omaha Life Insurance Co. v. Nob Hill Assoc., 450 So.2d 536, 539 (Fla. 3d DCA 1984) (United was a party to the contract between Nob Hill and Tower because the contract expressly provided that performance was "subject to acceptance by United"); Williams Electric Company, Inc. v. Honeywell, Inc., 772 F.Supp. 1225, 1236 (N.D. Fla. 1991) (Honeywell was a party to the contract between the plaintiff and the Air Force because Honeywell's supervision and recommendations were required for contract performance, and that requirement was "expressly incorporated into Williams' contract with the Air Force.")

Unlike the contracts in the cases above, however, the business relationship between Bates RVee and its floor plan financiers did not require Defendant's approval to enter into or continue, nor did performance pursuant to the relationship (i.e. securing continued financing) require Defendant's participation.  (See Bates Aff.).

Further, Defendant cites to Rabren v. Gulf Towing Co., 434 So.2d 340 (Fla. 2d DCA), and says that Rabren holds that "a party who was not disinterested third party to business relationship

10

[sic] could not interfere with such relationship." See Motion, pp. 10-11. A full and more precise reading of Rabren shows that Rabren holds that an employee or agent acting on behalf of a party to a business relationship is also a party to the business relationship. See Rabren, 434 So.2d at 341. Rabren is inapplicable to Defendant's situation because Defendant was neither an employee nor an agent of the floor plan financiers.

Moreover, a manufacturer's interest in the contract between a dealer and the dealer's lender does not transform the manufacturer into a party to the contract. For example, in Peacock v. GMAC, 432 So.2d 142 (Fla. 1st DCA 1983), Peacock Chevrolet, the dealer, sued GMAC, the lender, for tortious interference with the contract between the dealer and GM, the manufacturer. The lender, a wholly owned subsidiary of the manufacturer, financed the dealer's automobile purchases from the manufacturer. The lender argued that as a wholly owned subsidiary of the manufacturer, and as the dealer's lender in purchases from the manufacturer, it was a party to the contract between the dealer and the manufacturer. The First District Court of Appeal disagreed and held that the lender was not a party to the contract between the dealer and the manufacturer. In other words, the contract between a dealer and a lender is separate and distinct from the contract between a dealer and a manufacturer - even though the lender is funding the dealer's purchase of vehicles from the manufacturer.[5]

Therefore, Defendant was not a party to the advantageous business relationship between Bates RVee and its floor plan financiers; performance pursuant to the relationship was not subject

_____

[5] In *Cedar Hills Properties Corp. v. Eastern Federal Corporation*, 575 So.2d 673 (Fla. 1st DCA 1991) the First District Court of Appeal held that an agent of a party who acts within the authority of the agency relationship is also a party, even where the agent is a separate and distinct legal entity. The court distinguished *Peacock v. GMAC*, by suggesting for the first time that GMAC had an agency relationship with the manufacturer, but that it had not acted within the authority of its agency when it interfered in the dealer's and manufacturer's relationship. Even viewed from that perspective, Defendant is not a party: it is not a wholly owned subsidiary of the floor plan financiers, nor is it an agent of the floor plan financiers.

to Defendant's approval; Defendant was neither an employee nor agent of the floor plan financiers; and a mere interest in the performance of the relationship is not enough to transform a non-party into a party. Because Defendant was not a party to Bates RVee's advantageous business relationship, Bates RVee's TIABR claim is proper, and summary judgment is inappropriate.

### C.    Bates has Properly Stated a Claim for TIABR

Defendant's third argument in support of its Motion is that Bates RVee has failed to establish "that there was ever a breach of an agreement between the floor plan financiers and Plaintiff." (See Motion at 11). Defendant argues that establishing a breach of the agreement is "an essential element to the claim," of TIABR. (See id.). Defendant offers no case law to support its third argument, apparently relying upon the case it cited to earlier in its Motion (Johnson Enterprises) to provide the necessary foundation for its position.

First, as stated earlier (see page 6 (fn 3), above), the Johnson Enterprises case concerns a "tortious interference with a contract" claim, rather than a TIABR claim. See Johnson Enterprises, 162 F.3d at 1321. Thus Defendant's source for what the elements of a TIABR claim are is inappropriate.

Second, as discussed above in Section III, page 6, while there are many cases that suggest a breach is an element of a TIABR claim, there are also cases that do not require a breach, but rather merely an injury to the advantageous business relationship resulting in damages to the plaintiff. See William Electric Co., Inc., 772 F.Supp at 1235-1236; Wackenhut Corp., 389 at 657. It would appear that, under Florida law, the specific elements of a TIABR claim are dependent upon the specific facts of each case; thus, in the instance where a breach of a business relationship is alleged, evidence of that breach must be produced. See Ethan Allen, Inc., 647 So.2d at 814. However, where the interference resulted in damage to the relationship but did not destroy the relationship, evidence of

12

the damages suffered is sufficient for a TIABR claim.  See William Electric Co., Inc., 772 F.Supp at 1235-1236; Wackenhut Corp., 389 at 657.

Here, Bates RVee has alleged that Defendant's tortious interference with the business relationships Bates RVee had with its floor-plan creditors resulted in damages to that relationship short of a full breach.  (See Complaint, ¶ 24).  Bates RVee has offered into the record evidence of the damages resulting from Defendant's tortious interference.  (See Bates Dep. pp. 185-188). Therefore, Bates RVee has successfully stated a claim for TIABR under Florida law, and Defendant's Motion should be denied, as summary judgment is inappropriate.

     *D.*    *Defendant's Communications with the Floor-Plan Financiers were Not Privileged*

Defendant's fourth and final argument in support of its Motion is that any communications it made to Bates RVee's floor-plan financiers were privileged in nature, and therefore cannot be used as evidence to support Bates RVee's TIABR claim.  Defendant's position is without merit and its Motion should therefore be denied.

Florida courts grant a qualified privilege to actions taken to safeguard or promote one's financial interests, provided the financial interest is an interest in the nature of an investment.  See Johnson Enterprises, 162 F.3d at 1321-22 (privilege applied to the owner of a party's sole shareholder); Morsani v. Major League Baseball, 663 So.2d 653, 657 (Fla. 2d DCA 1995) (privilege would have applied to stockholders of a party whose approval was required for performance of the contract, but the stockholders employed improper means to interfere); Babson Bros. Co., v. Allison, 337 So.2d 848 (Fla. 1st DCA 1976) (privilege applied to the controlling stockholder of a party); Yoder v. Shell Oil Company, 405 So.2d 743, 744  (Fla. 2d DCA 1981) (jury instruction was incorrect where instruction did not limit application of the financial interest privilege to one who has an interest in the nature of an investment).

Defendant's interest in the floor plan financiers is not an interest in the nature of an investment. Defendant is neither a partner nor a stockholder of the floor plan financiers, NationsBank and Deutsche Financial Services. Once Bates RVee informed Defendant that it no longer wished to do business with Defendant, Defendant was required to repurchase and take possession of the unsold vehicles in Bates RVee's possession. (See Bates Aff.). Defendant was simply refunding the purchase money it had previously received from the floor plan financiers for its own stock - not investing in the floor plan financiers. (See id.).

However, even if Defendant's interference was privileged, it lost the protection of the privilege when it used improper means to interfere. See McCurdy v. Collis, 508 So.2d 380, 384 (Fla. 1st DCA 1987) ("the privilege carries with it the obligation to employ means that are not improper."); see also Morsani, 663 So.2d at 657 (defendants lost the privilege where they used threats, intimidation, and conspiratorial conduct to interfere with the plaintiff's attempt to acquire a professional baseball team). Interference by means of false and defamatory statements is improper. See Manufacturing Research Corporation v. Greenlee Tool Company, 693 F.2d 1037, 1040 (11th Cir. 1982) (evidence of defendant's false statements sufficiently supported jury's finding that the defendant tortiously interfered with the plaintiff's business relations); McCurdy, 508 So.2d at 384-85 (jury to resolve whether defendant improperly interfered when it had plaintiff fired by his employer for unsubstantiated safety concerns).

Here, Defendant intentionally interfered with Bates RVee's business relationships and contracts by making false and defamatory statements about Bates RVee to the floor plan financiers. (See Bates Dep., pp. 176-178). The determination of whether the interference was improper or not is ordinarily a factual question to be resolved by the jury. See Manufacturing Research Corporation, 693 F.2d at 1040 (citing Restatement of Torts 2d § 767 comment 1). Accordingly, since Defendant

14

is not entitled to a privilege, and, in the alternative, has waived any privilege due to its improper interference, Defendant's Motion should be denied and Bates RVee's TIABR claim should be allowed to proceed.

## IV. Conclusion

For all the reasons herein stated, Plaintiff Bates RVee respectfully requests that Defendant's Motion for Summary Judgment as to Count II of Plaintiff's Complaint be denied, and that Bates RVee's TIABR claim be allowed to proceed.

Michael D. Malfitano, Esq., Fla. Bar No. 288247
John W. Campbell, Esq., Fla. Bar No. 198021
Matthew S. Effland, Esq., Fla. Bar No. 0193951
CONSTANGY, BROOKS & SMITH, LLC.
100 W. Kennedy Boulevard, Suite 500
Post Office Box 1840
Tampa, FL 33601-1840
(813) 223-7166
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served by Hand Delivery on this 2nd day of April, 2001, upon Bruce Bennett, Esq., and Sam Youakim, Esq., Hinshaw & Culbertson, 100 S. Ashley Drive, Suite 830, Tampa, FL 33602-5348.

_____
ATTORNEY

COPY

1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                         TAMPA DIVISION

3

    BATES SHOW SALES STAFF, INC
4
        Plaintiff,
5
    vs.                           Case No.:  8:00-CV-322-T-27TVM
6
    GULF STREAM COACH, INC.,
7
        Defendant.
8

9

10                   DEPOSITION OF FRANK BATES

11      Counsel for Plaintiffs:

12          JOHN W. CAMPBELL, Esquire
            CONSTANGY, BROOKS & SMITH
13          100 W. Kennedy Boulevard, Suite 500
            Tampa, Florida  33602
14

15      Counsel for Defendant:

16          SAM YOUAKIM, Esquire
            HINSHAW & CULBERTSON
17          100 S. Ashley Drive
            Suite 830
18          Tampa, Florida  33602

19

        Reported by:  Suzanne E. Treadway
20                    March 2, 2001

21

22

23

24

25

1                           I N D E X

2     WITNESS                                    PAGE

3     Called by the Defendant
      FRANK BATES
4
      DIRECT EXAMINATION BY MR. YOUAKIM           04
5
      SIGNATURE PAGE                             247
6
      CERTIFICATE OF REPORTER OATH               248
7
      REPORTER'S DEPOSITION CERTIFICATE          249
8

9

10                         EXHIBITS

11   Defense Exhibit 1                             30
      Defense Exhibit 2                             47
12    Defense Exhibit 3                             90
      Defense Exhibit 4                             92
13    Defense Exhibit 5                            121
      Defense Exhibit 6                            140
14    Defense Exhibit 7                            148
      Defense Exhibit 8                            159
15    Defense Exhibit 9                            167
      Defense Exhibit 10                           175
16    Defense Exhibit 11                           191
      Defense Exhibit 12                           212
17    Defense Exhibit 13                           --
      Defense Exhibit 14                           227
18    Defense Exhibit 15                           228
      Defense Exhibit 16                           229
19    Defense Exhibit 17                           231
      Defense Exhibit 18                           232
20    Defense Exhibit 19                           234
      Defense Exhibit 20                           236
21    Defense Exhibit 21                           237
      Defense Exhibit 22                           237
22    Defense Exhibit 23                           237

23

24

25

1          Q.   You didn't have any Sunsports?

2          A.   Not of that model.

3          Q.   Okay.  What model was that?

4          A.   It is a small one.  I can't remember the size.  It

5     is a small floor plan.

6          Q.   Okay.  Did any damage occur to that Sunsport while

7     it was suspended in the crane?

8          A.   No, sir.

9          Q.   Did any birds come and live in and around that

10    Sunsport while it was hanging from the crane?

11         A.   There was some birds that live under in the

12    suspension system.  It makes a nice house for them

13    underneath.

14         Q.   Did you know that while it was hanging on the

15    crane?

16         A.   Sure, they do it on every one of them.

17         Q.   Did they get inside?

18         A.   No, sir.

19         Q.   Are you sure they didn't get inside?

20         A.   Yes, sir.

21         Q.   How do you know?

22         A.   Well, there was no evidence of them ever getting

23    inside.

24         Q.   Okay.

25         A.   They were very clean birds if they did get inside.

1      Q.   So when you took that Sunsport down, it is your

2    contention that it was fine inside?

3      A.   Yes, sir.

4      Q.   Okay.  How about the chassis?  Was that fine?

5      A.   Yes, sir.

6      Q.   Was there any damage to that Sunsport?

7      A.   No, sir.

8      Q.   Okay.  You said that Gulf Stream had left it in

9    the storage lot?

10      A.   Yes, sir.

11      Q.   When did you discover they had left it in the

12    storage lot?

13      A.   Maybe a month later.

14      Q.   Okay.  Would that be the same March '99 or late

15    February?

16      A.   March or April around in there.

17      Q.   How did you find out?

18      A.   I was told that they never paid for it and they

19    said they weren't going to pay for it and they took it away

20    and it was sitting.  So I went up there because the bank was

21    again getting mad because they wanted to know why it wasn't

22    paid for and where was it.

23      Q.   So that would be your second visit to the lot,

24    correct?

25      A.   It was second or third.  I don't remember how many

1    visits there was.

2        Q.    So you may have gone to see the vehicles more than

3    once at the lot?

4        A.    Could have, yes, sir.

5        Q.    Okay.  What would you do other than this one you

6    told me when you walked through because the bank wanted to

7    know where the vehicles were, what did you do at the other

8    visits?

9        A.    Mostly I drove in to make sure the vehicles were

10   there.

11       Q.    Okay.  So then in March or April of 1999, who told

12   you that they hadn't paid for the Sunsport?

13       A.    The bank I believe.

14       Q.    Do you remember which bank it was?

15       A.    Deutsche.

16       Q.    That's DFS?

17       A.    Yeah.

18       Q.    Okay.  How were you told, by letter, by phone?

19       A.    By letter, by phone, by in person, by raving bank

20   man standing in my front yard.

21       Q.    Who was the raving bank man?

22       A.    There is several of them.  Robert Mensy was a good

23   one.  He got real upset.

24       Q.    Who was the raving bank man who told you that the

25   Sunsport was still sitting on the lot or hadn't been paid

1      Q.   All right.  Let's go to the second count of your

2   complaint, which is tortious interference with a business

3   relationship.

4           Can you tell me about that?  What interference

5   occurred?

6      A.   They didn't pay off this coach that they were

7   supposed to pay off.  They shorted the money.  And put me in

8   a situation where the banks were upset with being put in the

9   situation they were put in and they were upset with me and

10   they were upset with Gulf Stream, and they kept coming to me

11   telling me you got to pay these things because, you know,

12   Gulf Stream won't pay it.  I said, well, go get Gulf Stream.

13           It came to the point that the bank said to me if

14   you don't take care of these it is going to hurt our

15   relationship and we are going to charge you higher interest

16   rates, you know.  We are going to -- it's going to hurt our

17   relationship and strain our relationship.

18      Q.   Okay.

19      A.   It did strain our relationship.

20      Q.   Did you ever have to pay higher interest rates

21   because of that?

22      A.   I was not considered in good standing with the

23   banks to get better rates, so I don't know if I got higher

24   rates or not because I was not in good standing with the

25   bank because of this.

1    Q.   Let's go through specifics.   What specific acts or

2   communications did Gulf Stream do that interfered with the

3   relationship?

4        Let me ask you first.   What relationship

5   specifically were interfered with?

6    A.   The banks.

7    Q.   Does that mean Deutsche and Nations?

8    A.   Yes.

9    Q.   When you mean with the banks, you mean the floor

10  plan?

11   A.   Right, the floor plan companies.   It might have

12  also been some problems that I am not aware of when

13  companies called for rating on us because we had outstanding

14  that were way, way overdue.

15   Q.   But are not aware of any of that?

16   A.   No, I am not.

17   Q.   Okay.   That's just speculation on your part?

18        MR. CAMPBELL:   Object to the form.

19   A.   It happens.

20   Q.   But did it happen in this instance?

21   A.   I have no idea.

22   Q.   Okay.   What specifically did Gulf Stream do to

23  interfere with this business relationship?

24   A.   They did not pay off the Sunsport.

25   Q.   Okay.   So that's --

1      A.    That's the main thing.   They also shorted the

2    moneys.

3      Q.    Who financed the Sunsport?

4      A.    Deutsche Financial.

5      Q.    All right.   What else?

6      A.    They didn't pay off -- they shorted the -- you

7    know, shorted the pay offs.

8      Q.    All right.   Did they make malicious

9    communications?

10     A.    Possibly, yeah.   I am not sure.

11     Q.    What malicious communication?

12     A.    I would have to check with the banks.

13     Q.    What do you know are malicious communications that

14   Gulf Stream made to the floor plan providers?

15     A.    I guess I need to understand what malicious means.

16     Q.    I don't know, but you contended they made

17   malicious communications, so I am wondering or made

18   communications with malice.

19     A.    Malice.   Okay.   Malicious and malice are two

20   different things.

21     Q.    What did they do with malice?

22     A.    Well, with malice they didn't pay off the -- first

23   of all, they said that I agreed to pay it off, which I never

24   did.   They made communications with Gulf Stream where Phil

25   Sarvari agreed to pay it off.   Then he didn't do what he

1    said.  Maybe I don't understand malice exactly right.

2        Q.   Do you think they went out of their way to mess up

3    your credit?

4        A.   They sure didn't go out of my way to keep it nice.

5        Q.   Do you think they were doing what they considered

6    protecting their own interest?

7        A.   No.  I think they -- actually I do believe they

8    went out of their -- I truly believe they went out of their

9    way to hurt us on this Sunsport because they agreed to pick

10   every new coach up.  We talked about the Sunsport.  They

11   were picking it up.  They were going to pay it off and then

12   they didn't.

13       Q.   All right.  So what specific communications did

14   they make to DFS about the Sunsport with the intent to mess

15   up your credit?

16       A.   Well, DFS got a copy of that letter where they

17   said they would pick up all new products and then they

18   didn't do it.  That hurt my credit because DFS said, look,

19   you said they were going to pay them all off.  They didn't.

20   Well, here is a letter they are going to pay them, but they

21   didn't pay them off.

22       Q.   Okay.  Do you remember the date of that letter?

23       A.   Yeah, you got a copy of the letter.

24       Q.   Was that exhibit like Number 1?

25       A.   It says at the top of it that at your request --

1    signed by Phil **Sarvari**.  At your request Gulf Stream Coach

2    will be arriving at your dealership to inspect and remove

3    all new Gulf Stream products.

4         Q.   Okay.  It also says --

5         A.   Gulf **Stream** will pay off your floor plan sources

6    at original invoice minus any costs for missing parts or

7    damage.

8         Q.   Okay.  So it says minus costs, missing parts or

9    damage?

10        A.   Yeah.

11        Q.   Okay.  Now, when we were going over the damages

12   you were claiming for the breach of contract, you were

13   looking at the principal due and you said that you had

14   revisited the report that Gulf Stream had made, correct?

15        A.   Yes.

16        Q.   Is that correct?

17        A.   Uh-huh, yes.  I am sorry.

18        Q.   **That's all right.**

19             When you revisited that report recently, you

20   determined that some of the things that Gulf Stream had said

21   that you thought were incorrect might actually be correct;

22   is that an accurate statement?

23        A.   Yes.

24        Q.   Do you think that Gulf Stream was making those --

25   taking the position that there is something here and

1    something wrong there with the intent to hurt you?

2         A.   Yes, on this particular unit.

3         Q.   Or were they doing it with the intent of not

4    paying something that they don't believe they owe?

5         A.   No, they were doing it to hurt me at this point.

6         Q.   What evidence do you have that they actually did

7    it hurt you?

8         A.   Okay.  The evidence I have --

9              MR. CAMPBELL:  There.  It is in your hands as

10            well, Sam.  295.  Come on.

11             MR. YOUAKIM:  Let me see it.

12             MR. CAMPBELL:  295 and 296 Mr. Sarvari's letter

13            containing false and malicious statements.

14             MR. YOUAKIM:  Okay.  We might as well attach it.

15             MR. CAMPBELL:  Make a copy, please.  That's my

16            file copy.

17             THE COURT REPORTER:  Okay.

18             (Thereupon, an off-the-record discussion was had

19            and Defense Exhibit 10 was marked after which the

20            following proceedings were had.)

21             MR. YOUAKIM:  We're back.

22    BY MR. YOUAKIM:

23         Q.   Can you take a look at Exhibit 10?   Do you

24    recognize this document?

25         A.   Yes.

1     Q.   Okay.  What is it?

2     A.   It is a letter from Gulf Stream to us telling --

3     that's pretty good -- no.  I am sorry.  It is saying that

4     this unit was dropped and damaged by being dropped from a

5     crane and waterfowl living in it.  The unit cannot be

6     repurchased because it cannot be restored to saleable

7     condition.

8     Q.   Okay.  Let me ask you this just so we can get -- I

9     think we are getting a little muddled.  I am trying to find

10    out exactly what communications and what nature of the

11    communications you allege tortiously interfered with your

12    business relationship with the floor plan providers.

13         It seems to me -- and if I am wrong, tell me, but

14    it seems to me that what you are saying is the

15    communications regarding the Sunsport are the true basis of

16    your claim.

17         Is there anything else?

18         MR. CAMPBELL:  Object to the form.

19    A.   The Sunsport is the core of it and then everything

20    else around it just adds to it.

21    Q.   What is the everything else around it?

22    A.   The shortages and not being willing to negotiate

23    or talk about what I feel is fair and what isn't.  They had

24    the attitude this is the way it is.  If you don't like it,

25    go get a lawyer.

1      Q.   Not negotiating with you is one thing.   What I am

2   asking --

3      A.   You are talking about the bank.

4      Q.   What did they do with the bank that you say

5   interfered with your actions?

6      A.   Well, they didn't pay for this.   They told the

7   bank we dropped it from a crane and had waterfowl living in

8   it.

9      Q.   This is the Sunsport, correct?

10      A.   Right.

11      Q.   What else?

12      A.   The fact that they won't pay for this unit.

13   That's about it I guess other than the shortages.

14      Q.   All right.   The shortages you yourself said upon

15   revisiting there is a question about some of it?

16      A.   Some of it, yes.

17      Q.   So would you say that's malicious or was malice or

18   would you say that's a disagreement about certain facts?

19          MR. CAMPBELL:  Object to the form.

20      A.   Okay.  I want to be as reasonable as I can here.

21   And I would say that it was they were unreasonable and put

22   me at harm with the bank because they would not discuss the

23   shortages.

24      Q.   Okay.  So their lack of negotiations with you

25   about the shortages is what put you at risk with the bank?

1        A.    Right, because the bank is saying to me you need

2   to pay these.  I am saying I don't owe them.  I owe a

3   portion of them, but Gulf Stream owes.  Several times I

4   said, look, I'm willing to split this.  At one point Gulf

5   Stream even agreed to some type.  Then Phil Sarvari came

6   back and said, I can't do that.  I am sorry.  I agreed to

7   it, but I can't do it.

8        Q.    Other than this specific letter, which is

9   Exhibit 10, is there another specific conversation or

10  letter?

11       A.    I guess this is the only thing in writing that I

12  have got.

13       Q.    Do you know of any specific phone conversation

14  between Gulf Stream and the bank that interfered with your

15  business relationship?

16       A.    When they said they wouldn't pay for this coach.

17       Q.    So we are back to the Sunsport.  Let's just lay

18  aside the Sunsport for a second.

19       A.    Okay.

20       Q.    Other than the Sunsport, do you know of any phone

21  conversation or face-to-face conversation between somebody

22  from Gulf Stream and somebody from one of your floor plan

23  providers where something was said that interfered with your

24  relationship?

25       A.    No, there were things eluded to, but the bank

1    won't say anything because they are also the -- they also

2    work with Gulf Stream.

3         Q.   So you don't know of any specific conversation?

4         A.   No.

5         Q.   Okay.  So your tortious interference claim is

6    basically that Gulf Stream said -- well, let me just ask

7    you.  He is going to object to form, but whatever.

8              MR. CAMPBELL:  That's correct.  I suspect.

9         Q.   Aside from this letter and Gulf Streams I guess

10   not paying off the Sunsport, and what you have said was Gulf

11   Stream's lack or willingness to discuss the shortages, was

12   there anything else that interfered with the business

13   relationship?

14        A.   The fact that they made agreements and then they

15   didn't live up to them, but that's --

16             THE DEPONENT:  Am I missing anything here?

17             MR. CAMPBELL:  Yeah, but that's okay.  You are not

18        required to answer if you can't think of it or don't

19        recall it.

20             THE DEPONENT:  I can't remember.  This has all

21        been awhile back.

22        A.   What I remember is the banks calling me up saying

23   you got a problem here.  You need to get this handled.  You

24   need to get Gulf Stream to handle it.

25        Q.   What was the problem?

1    A.    The problem is the coaches weren't being paid for.

2          The other thing that hurt me is because they

3    didn't pay off the coaches after they took them.  They kept

4    dragging their feet.  You got to --

5    Q.    Okay.  What I am looking for is specific things

6    that were said by Gulf Stream to the floor plan providers

7    with the intent to --

8    A.    We are not paying for the coaches today.

9    Q.    Okay.

10   A.    The next day we are not paying for the coaches

11   today.  The next day we are not paying for the coaches

12   today.

13         MR. CAMPBELL:  Please don't go on for the rest of

14         the years.

15   Q.    Okay.  Do you know what specific days that was

16   said?

17   A.    You know, everyday they called them, you know.

18   There is one interest bill that shows up until whatever it

19   was for -- you have got the bill there.  I can't remember.

20   For several months they didn't pay for the coaches after

21   they picked them up.

22   Q.    Okay.  Do you know why Gulf Stream believes that

23   this Sunsport was dropped from the crane?

24   A.    No, but I would be tickled to death to see if they

25   would like to do it and see if it looks different than it

1    does now.

2         Q.   Do you know why they think that there was

3    waterfowl living in it?

4         A.   First of all, waterfowl doesn't live at I-4 Exit

5    9.  I have never seen any waterfowl there.

6         Q.   Okay.  Aside from the ornithology.

7              MR. CAMPBELL:  Let's limit it to bird.

8              THE DEPONENT:  I assume he was talking about

9         birds.

10             MR. CAMPBELL:  Let's forget the type of bird.  Was

11        there a bird living there?

12   BY MR. YOUAKIM:

13        Q.   I am just wondering do you have any idea why they

14   think that?

15        A.   No, I don't.

16        Q.   Okay.

17        A.   There may have been -- excuse me.  There may have

18   been a statement to the fact that there were birds living in

19   the coach, but we --

20        Q.   By whom?

21        A.   I don't know by who.  It could have been even me.

22   The thing about is living in may have been misconstrued as

23   being inside the vehicle.

24        Q.   Okay.  Like I said, I am just trying to find out

25   what your claim is.  So we got the Sunsport.  You claim

1    that's interference with your relationship?

2        A.   Yes.

3        Q.   We got you are not negotiating with them.   Then

4    you saying just the general -- I am trying to get a

5    description of it from you.

6             Is it your position that it is the general

7    attitude of Gulf Stream that we have certain issues with

8    certain coaches and we are not going to pay until those

9    issues are resolved?

10       A.   They wouldn't even pay minus the issues for

11   awhile.

12       Q.   Is it your position that that's what interfered

13   with your business relationship?

14       A.   Yes, that interfered.   The Sunsport interfered.

15       Q.   Okay.   What else?

16       A.   The fact that we could not come to a conclusion on

17   this.

18       Q.   But that's between you and Gulf Stream, correct?

19       A.   No.   You see the bank at this point came in and

20   said you need to sue Gulf Stream.

21       Q.   Where did it say you need to sue Gulf Stream?

22       A.   Well, I don't know if they will say it, but they

23   sat in my office and you were on the phone; weren't you?

24            MR. CAMPBELL:   Don't get me involved in this.

25       Q.   Who sat in your office?

1        A.    The bank.

2        Q.    With whom?

3        A.    Deutsche.

4        Q.    Who?

5        A.    John Anderson.

6        Q.    Okay.  When was he sitting in your office?

7        A.    Right before we went to lawsuit on this thing.

8        Q.    Do you remember the day?

9        A.    No, I don't remember the day.

10       Q.    Who else was there?

11       A.    I live believe John McKelvy may was there.

12       Q.    Who is John McKelvy?

13       A.    He is also Deutsche Financial.

14       Q.    How do you spell that?

15       A.    I am not sure.

16       Q.    Who else was at the meeting?

17       A.    It was just those two.

18       Q.    And was Mr. Campbell on the phone?

19       A.    I think he was on the phone later after.  No.  I

20  am sorry.  He was on the phone later after because I had to

21  prove to them that we had started the lawsuit.  That's what

22  it was.  I called John and I said, John, tell these bankers

23  we have got a lawsuit.  He said, yes.

24       Q.    Why did they tell you they wanted you to sue Gulf

25  Stream?

1     A.    Because they felt that it would never come to a

2   conclusion unless there was a lawsuit brought to force it to

3   a conclusion, and they were not going to do it because they

4   didn't feel they were -- they were put in this position by

5   Gulf Stream and me, and they didn't feel that it was right

6   that they were in that position.

7         The other thing is there was a certain term of

8   days when a bank has to write off a loan.

9     Q.    Right.

10    A.    They were trying to justify to their board that

11  things were happening to make this come to a conclusion.

12    Q.    Why did they tell you to sue Gulf Stream as

13  opposed to Gulf Stream to sue you?

14    A.    Because they felt that the money was owed to me.

15    Q.    Was the money owed to you or DFS?

16    A.    Money owed to them.

17    Q.    Okay.  Do you have a letter or anything that says

18  that?

19    A.    No, I don't.  They won't -- you know, probably if

20  you subpoena them, they will probably come in and tell you.

21    Q.    You don't remember the day?

22    A.    I don't remember the date.

23    Q.    Do you have any specific comments that Gulf Stream

24  made to DFS or Nations Bank other than this letter about the

25  Sunsport on any specific day?

1       A.   I don't remember.

2       Q.   You don't have any?

3       A.   No.

4       Q.   So it is basically the Sunsport?

5       A.   Yeah, the fact that it was so ridiculous to look

6   at the Sunsport and say that it was dropped from a crane

7   after they saw it.

8       Q.   Okay.  What was the harm done?  What were your

9   damages?

10      A.   I couldn't get a larger floor plan because of

11  this.  This held back increase in floor plan.

12      Q.   Who did?

13      A.   Deutsche.

14      Q.   How about Nations Bank?

15      A.   I don't know about Nations or not.

16      Q.   How long did this go on?

17      A.   From when they pick them up until I finally

18  they -- they demanded I pay the coach off.

19      Q.   When did you do that?

20      A.   Huh?

21      Q.   When did you do that?

22      A.   When I paid it off here recently in the last month

23  or so, so it has been going on for all that time.

24      Q.   Okay.  What I am trying to find out is what

25  damages you are claiming specifically.

1    A.   Loss of business.

2    Q.   What business?

3    A.   The business of not being able to buy motor homes

4  to sell motor homes because my floor plan was to the top and

5  I couldn't get any more floor planned.

6    Q.   Could you go through Nations?

7    A.   I think I was topped there, too, at one point.  I

8  was topped with every manufacturer.

9    Q.   Every manufacturer or floor plan company?

10   A.   Every floor plan company.  But I also couldn't get

11  more used floor plan from Deutsche because of this.

12   Q.   Do you have any letter that specifically says --

13   A.   But you ask them.  They will tell.

14   Q.   Do you have any recollection of a specific

15  conversation where they said that?

16   A.   I might be able to --

17        MR. CAMPBELL:  Do you mean the date?

18        MR. YOUAKIM:  Date, time, circumstances, people.

19        THE DEPONENT:  Do you have anything that says

20     that?

21        MR. CAMPBELL:  Don't ask me.

22        THE DEPONENT:  I can't ask you?

23        MR. CAMPBELL:  Not right now.

24        THE DEPONENT:  Well, what does that mean?

25        MR. CAMPBELL:  I will explain that later.

1          THE DEPONENT:  All right.

2      A.   No, but there is letters that I could search for

3  you down I think that will tell you that.  If you ask them,

4  they will tell you.  They are very reluctant to put anything

5  in a letter.

6      Q.   Okay.  How was your Nations Bank credit line?  Was

7  that harmed at all?

8      A.   It was a problem with Nations, but it was not as

9  much of a problem as it was with Deutsche?

10     Q.   What do you mean by that?

11     A.   In other words, I didn't owe them as much money,

12 so they weren't quite as upset about it.

13     Q.   Did they raise your rates?

14     A.   I would have to ask them.  I don't know.

15     Q.   Is there some specific financial monetary amount

16 that you have placed on this damage?

17     A.   That could be millions because of not being able

18 to have used floor and not being able to buy more new

19 coaches.

20     Q.   You don't know what it is?

21     A.   Boy, I could figure it out for you probably with

22 an estimate by how many coaches you stock and how many you

23 sell and everything.  There is probably a formula to do.

24     Q.   But you haven't done it?

25     A.   I haven't done it.

1    Q.    Were there any other reasons why you might have

2    trouble getting floor plans?

3    A.    Yeah, because also if you are not current on a

4    particular product or you have got a problem out there and

5    another financial institution calls, you know, you got this

6    one thing or he has got this or whatever.

7    Q.    Okay.

8    A.    I think that's the one letter where they demanded;

9    isn't it?

10    Q.    So what did Deutsche Financial make you do?

11    A.    They made me pay it off.   Isn't that what it says

12    on that letter?

13    Q.    Did they do anything else?

14    A.    What do you mean?

15    Q.    Other than making you pay if off, did they make

16    you do anything else?

17    A.    For what?

18    Q.    Well, you said you had credit problems with

19    Deutsche Financial.

20    A.    Let me read the letter.   You got the letter.   I

21    can't remember.

22    Q.    I am just asking you what did they make you do?

23    A.    I don't remember.

24    Q.    Did you have any other problems with Deutsche

25    Financial not related to Gulf Stream?

1        A.   Possibly.

2        Q.   What might those have been?

3        A.   I don't know.  You got the letter.

4        Q.   I am not asking about the letter.  I am asking

5    what problems you has with Deutsche.

6             MR. CAMPBELL:  He has asked to see the letter.  If

7        you don't want to show it to him, then live with the

8        answer you get.

9             MR. YOUAKIM:  Well, I am asking him something else

10        right now.

11   BY MR. YOUAKIM:

12        Q.   What do you remember?

13        A.   I remember I probably had -- I don't know what

14   else.

15        Q.   Do you remember three months ago?

16        A.   No.

17        Q.   You don't remember three months ago?

18        A.   No.

19        Q.   Do you remember six months ago?

20        A.   No.

21             MR. CAMPBELL:  Object to the form.  We are getting

22        real close to ending this deposition.  Move on.

23             MR. YOUAKIM:  Let's go off the record for a

24        second.

25             MR. CAMPBELL:  No, we are on the record.

1      MR. YOUAKIM:  Okay.  I am asking him if he

2    remembers three months ago simply put.

3      MR. CAMPBELL:  I am going to object to the form of

4    these questions.  We will be stopping very shortly.

5      MR. YOUAKIM:  On what basis?

6      MR. CAMPBELL:  On the basis of this is getting

7    harassing and argumentative.  It really is.  It is the

8    tone and everything else.

9      You are sitting there holding a letter and you

10    won't even show it to him even though he has asked for

11    it at least two times.  You are trying to play the

12    memory game with him.

13      MR. YOUAKIM:  I am simply trying to find out if he

14    remembers --

15      THE DEPONENT:  Sam, I gave you the letter.  Let me

16    look at the letter.

17  BY MR. YOUAKIM:

18      Q.  I know you gave me the letter.  Fine.  Look at the

19  letter.

20      A.  Jeeze.

21      Q.  Okay.

22      A.  They wanted curtailments and they wanted a certain

23  amount of money paid.  However, as soon as I paid off the

24  coach here, Sam --

25      Q.  Wait.  Let's --

1      A.   Time here for a second.  As soon as I paid it off,

2    they waived every bit of everything else on here.

3           MR. YOUAKIM:  All right.  Let's make this an

4      Exhibit Number 11.

5           (Thereupon, Defendant's Exhibit 11 was marked for

6      identification and the following proceedings

7      were had.)

8    BY MR. YOUAKIM:

9      Q.   Can you look at the letter?

10     A.   Yes.

11     Q.   Do you recognize this document?

12     A.   Yes.

13     Q.   What is this document?

14     A.   This is a letter sent to me from Deutsche

15   Financial on December 16th, 2000.

16     Q.   Okay.  What is the subject?  Who is it from?

17     A.   It is from John Anderson.

18     Q.   Okay.  What is this letter about?

19     A.   It is about the pay off of the Gulf Stream unit

20   and a curtailment on coaches over 540 days old.

21     Q.   Okay.  There is four items listed on this letter,

22   correct?

23     A.   Yes.

24     Q.   Okay.  Number 1 is pay off the Gulf Stream unit.

25   We have discussed that, correct?

1    A.   Right.

2    Q.   What does Number 2 mean?  What is that about?

3    A.   It says immediately pay 63,000 into nonrepurchased

4    inventory over 540 days old.

5    Q.   What is that about?

6    A.   That's about when a coach is over a certain age,

7    the manufacturer normally will not sign repurchase on that

8    coach anymore.

9    Q.   All right.  What coaches is that about?

10   A.   That's about Safaris and Beavers and every other

11   coach that I sell basically.

12   Q.   Okay.  540 days is a year and a half?

13   A.   Yeah.

14   Q.   Okay.  So do you have inventory on your lot that's

15   over a year and a half old?

16   A.   Yes.

17   Q.   Is that that you purchased on floor plan new?

18   A.   Yes.

19   Q.   Okay.  And what were they specifically requested?

20   A.   They were requesting curtailment of 63,641.

21   Q.   What's Number 3?

22   A.   Number 3 is that they would get another payment of

23   10 percent on all of these units at 2/1/01.  I am sorry.  I

24   meant to turn that off.

25   Q.   Do you want to return it or whatever?

1      A.    No, it is okay.   It's not going to be that

2 important.   You are more important than they are.

3      Q.    Thanks.

4      A.    Okay.

5      Q.    These units are not Gulf Streams the Number 2 and

6 Number 3, correct?

7      A.    Right.

8      Q.    So how many units over 540 days old did you have

9 on your lot in December?

10     A.    I don't remember.

11     Q.    Could you give me a rough estimate?

12     A.    Ten.

13     Q.    Okay.   And what is Number 4 about?

14     A.    4 is about DFS will reevaluate all units over

15 100 -- over one year old on 3/31/01 to determine what other

16 additional equity payments will be required from Bates.

17     Q.    Why would they do that?

18     A.    Well, because they are trying to get more security

19 into their house on older coaches.

20     Q.    Okay.   So as they age, they lose value?

21     A.    Right.

22     Q.    And the finance company wants to make sure it's

23 protected?

24     A.    Right.

25     Q.    Now, Number 1 deals with Gulf Stream.

1          Is there anything else on this letter that deals

2     with Gulf Stream?

3          A.   No, but you notice it was listed Number 1.

4          Q.   I understand.   But is there anything else that

5     deals with Gulf Stream?

6          A.   No.

7          Q.   At the bottom there is something that says

8     acceptance agreement and there is a line with your name

9     representing Bates Show Sale Staff.   You didn't sign this

10    letter, correct?

11         A.   No.

12         Q.   Did you ever sign this letter?

13         A.   I think I did eventually.

14         Q.   Okay.   Do you have a signed copy of this letter?

15         A.   This letter was actually redone after I paid off

16    the Gulf Stream and everything was reevaluated.

17         Q.   Okay.   Do you have the reevaluation letter?

18         A.   I probably do, but a lot of it was done verbally,

19    too.

20         Q.   Do you know what the reevaluation was?

21         A.   Basically the immediately pay 63,000 turned into

22    like 10,000.   I did pay like 10,000.   And then 10 percent

23    payment on all 540 days old was waived.   And the reevaluate

24    all units over one year old at 3/31 I believe that was

25    waived, too, almost indefinitely.

1        MR. YOUAKIM:  Do you have any objections, John, to

2      producing that document to us?

3        MR. CAMPBELL:  If it exists.

4        THE DEPONENT:  I will have to find it.

5        MR. YOUAKIM:  If it exists, you have an objection?

6        MR. CAMPBELL:  If it exists, we will certainly

7      produce it if he can find it.

8 BY MR. YOUAKIM:

9      Q.   Is it fair to say then that you had other issues

10 with Deutsche other than the Gulf Stream unit?

11        MR. CAMPBELL:  Object to the form.

12     A.   It will be fair to say that I had very few other

13 problems once I paid off the Gulf Stream unit.

14      Q.   Okay.  At the time of this letter did you have

15 issues with Deutsche Financial other than the Sunsport?

16        MR. CAMPBELL:  Object to the form.

17     A.   I had very small, irrelevant issues other than the

18 Gulf Stream.

19        MR. YOUAKIM:  Can we go off for just a second?

20        (Thereupon, an off-the-record discussion was had

21      after which the following proceedings were had.)

22 BY MR. YOUAKIM:

23      Q.   So you had other issues with Deutsche Financial

24 other than the Gulf Stream unit?

25        MR. CAMPBELL:  Object to form.

1      A.    I had real small, insignificant.

2      Q.    But there were other issues?

3      A.    Insignificant problems other than Gulf Stream.

4      Q.    In your opinion they were insignificant?

5      A.    Yes, and in their opinion they were.

6      Q.    Who at Deutsche Financial said that they were

7  insignificant?

8      A.    I think the fact that they waived all of them or

9  cut them all dramatically once I paid off the Gulf Stream

10 unit kind of proves it.

11     Q.    Okay.  I have asked you this before, but I just

12 want to make sure you tell me everything that you are

13 contending is tortious interference.

14          So if there is anything else you are contending is

15 tortious interference that damaged your business

16 relationship, tell me now.

17     A.    Okay.  Their attitude, Gulf Streams attitude

18 towards this.

19     Q.    Towards what?

20     A.    Towards this entire situation of buying back the

21 coaches.

22     Q.    Okay.

23     A.    They were totally unprofessional.  They didn't act

24 in a timely manner.  They made statements that they later

25 changed.  They didn't live up to their part of the bargain.

1    They said that I **had dropped** vehicles from cranes, which I

2    had not.

3         Q.   That's the Sunsport, right?

4         A.   Other **than** the Sunsport.  But to even tell a bank

5    that you have **dropped** a vehicle from a crane and not told

6    the bank, makes the **bank** mad because they feel like you are

7    not protecting their inventory.

8         Q.   Okay.

9         A.   So that's **just** general --

10        Q.   Is there **anything** else?

11        A.   Let me think about it for a second.

12        Q.   Sure.

13        A.   The fact that I couldn't get a larger line of

14   financing.

15        Q.   That **was a damage**, right?

16        A.   That **was a damage**.  I am sorry.  Okay.  What else?

17   I guess that's about it.

18        Q.   Okay.  They didn't act timely.  What specifically

19   is that?

20        A.   Well, the fact that they didn't pay off the units

21   in a timely manner.

22        Q.   All right.  The **attitude, wh**at specifically is

23   that?

24        A.   That they would not talk to us.  I asked to --

25        Q.   Us meaning?

1       A.   Well, me.   I asked to talk with Jim Shea several

2   times the owner who is the owner of the company.   They

3   wouldn't let me talk to him.

4       Q.   Once again, I am looking for stuff that they did

5   towards the bank.

6       A.   Well, this is doing it towards the bank.

7       Q.   That they told the bank.   They made statements to

8   the bank.

9       A.   I guess you are going to have to stick with what

10  they wrote in the letter.   I don't know what else they told

11  the bank.   I know the bank had made references to things

12  that the bank was in a situation that they cannot tell me

13  what is being said.

14      Q.   How is your credit now?

15      A.   Fine.

16      Q.   Okay.   In the credit with Nations Bank, did you

17  have any restrictions with Nations Bank based on --

18      A.   They increased it after all of this went away.

19      Q.   Nations Bank did?

20      A.   Yes, so did Deutsche.

21      Q.   Were you told by anybody at Nations Bank that they

22  were limiting you or holding you down or giving you a

23  higher --

24      A.   Yes.

25      Q.   Who were you told that by?

1       A.    Same Scott and John Anderson both told me that

2   this Sunsport is a problem and it need to go away.

3       Q.    Who is Sam Scott?

4       A.    Sam Scott is my representative for Nations.

5       Q.    Okay.

6       A.    He said the problem with -- there is shortages and

7   it needs to go away.  John Anderson said the Sunsport is a

8   problem and needs to go away.

9       Q.    Did Sam Scott tell you specifically something was

10  going to happen to your interest rate because of the

11  Sunsport?

12      A.    If you borrow money from a loan shark and he tells

13  you pay me or else, you don't have to have wait for the or

14  else to be told to you specifically.

15      Q.    Okay.  But did he tell you something specifically?

16  Did he say if you don't -- you know, the Sunsport is out

17  there.  Your interest rate is going to go up from Nations

18  Bank?

19      A.    He said that the Sunsport is hurting our -- Sam

20  Scott said the shortages is hurting the relationship.  John

21  Anderson said the Sunsport is hurting our relationship.

22      Q.    Okay.  What I am looking for specifically is what

23  actually happened?

24      A.    You are going to have to ask them.

25      Q.    So you don't know exactly how you were harmed by

1    Nations Bank?

2          A.    No, I know they didn't increase my credit line.

3          Q.    Well, I thought that was DFS.

4          A.    That was DFS.  Yeah.  I am sorry.

5          Q.    I am talking about Nations.

6          A.    I am clumping them together.

7          Q.    I am trying get them separated so I understand

8    this.

9                There is two companies and I am trying to find out

10   specifically what happened to each one.

11         A.    I don't know specifically.  I know that I could

12   not get an increase with Sam Scott until I paid off the

13   shortages.

14         Q.    At Nations Bank?

15         A.    At Nations there is no way they would increase my

16   credit when I owed them money.  It just ain't going to

17   happen.

18         Q.    Okay.  DFS you have already said that they

19   wouldn't increase your credit?

20         A.    Right.

21         Q.    Until you paid off the Sunsport?

22         A.    Right.

23         Q.    Was there anything else?

24         A.    They wanted the shortages paid off.

25         Q.    Okay.  When did you pay off the shortages to

1  Nations Bank?

2      A.   I paid them off a lot earlier.  I don't know when.

3  It wasn't that big of a deal.  It wasn't, you know, as much

4  money.

5      Q.   Was it 1999?

6      A.   I would say it was probably in '99.

7      Q.   All right.  Other than the Sunsport, let's put

8  aside the Sunsport for a second.

9           How about the shortages at DFS?

10     A.   They were paid later than that, but I don't know

11  when.

12     Q.   Do you have checks for both of these?

13     A.   Yeah, we got checks.

14     Q.   Is there anything else in tortious interference

15  stuff?

16     A.   I don't think so.  That floor plan thing is a

17  pretty big deal.  If you can't buy new product, you can't

18  sell it.  You can't make money.

19     Q.   Did they shrink your floor plan?

20     A.   No.

21     Q.   Your floor plan stayed the same?

22     A.   They may have shrunk it.  They may have shrunk it.

23  I will have to go back and check.

24     Q.   DFS?

25     A.   Yes.

1      Q.   I think they may have.

2           (Thereupon, an off-the-record discussion was had

3      after which the following proceedings were had.)

4  BY MR. YOUAKIM:

5      Q.   All right.  Let me ask you specifically about RVs

6  being used for advertising purposes other than the Sunsport.

7           Were any other RVs used for advertising purposes?

8  Any of the RVs that are involved in this?

9      A.   Not that I remember.

10     Q.   Okay.  Let me just do something real fast.  Go

11  back to the interrogatories.  There is an attachment to the

12  interrogatories.  It is Exhibit A.

13     A.   Okay.  Let's find them.  Here they are.

14     Q.   These are the attachments.

15     A.   Okay.

16     Q.   Now, look at the attachments, please.

17     A.   Okay.

18     Q.   Take a look at them.  What are those?

19     A.   These are invoices.

20     Q.   Okay.  Are those the invoices for all the vehicles

21  which are the subject of this lawsuit?

22     A.   Yes.

23     Q.   All right.

24          MR. CAMPBELL:  Well, without him sitting down and

25     looking at all of them?

1        CERTIFICATE OF REPORTER OATH

2

3

4

STATE OF FLORIDA

5

COUNTY OF SARASOTA

6

7

         I, the undersigned authority, hereby certify

8

that the witness named herein personally appeared

9

before me and was duly sworn.

10

11        WITNESS my hand and official seal this

7th day of March , 2001.

12

13

14

15        _____

         Suzanne E. Treadway

16        Notary Public-State of Florida

17

18        SUZANNE E. TREADWAY

         My Comm Exp 6/15/2002

19        No. CC 761517

         ( ) Personally Known [ ] Other I.D.

20

21

22

23

24

25

1          REPORTER'S DEPOSITION CERTIFICATE

2

3     STATE OF FLORIDA
      COUNTY OF SARASOTA

4

5
              I, Suzanne E. Treadway, Court Reporter, and Notary
6     Public in and for the State of Florida at large, hereby
      certify that the witness appeared before me for the taking of
7     the foregoing deposition, and that I was authorized to and
      did stenographically and electronically report the
8     deposition; and that a review of the transcript was
      requested; and that the transcript is a true and complete
9     record of my stenographic notes and recordings thereof.

10

11            I FURTHER CERTIFY that I am neither an attorney
      nor counsel for the parties to this cause nor a relative
12    or employee of any attorney or party connected with this
      litigation, nor am I financially interested in the outcome
13    of this action.

14
              DATED THIS 7th day of March 2001, at
15    Sarasota, Sarasota County, Florida.

16

17

18

19    _____
      Suzanne E. Treadway
20    Notary Public-State of Florida

21

22

23

24

25

SCLAFANI WILLIAMS COURT REPORTERS, INC.
1-800-272-0404



**P.O. Box 1005 • Nappanee, IN 46550 • (219) 773-7761 • Fax (219) 773-5761**

April 19, 1999

Frank Bates
Bates RVee Exchange

Dear Frank:

Concerning your letter of April 6, 1999, as you are aware there was substantial damage and shortages involved in the repair of your Gulf Stream inventory that we were required to repurchase. After our dedicated crew repaired these units and restored them back to saleable condition, we promptly paid the appropriate finance company less the cost of any damaged or missing items. This cost remains your responsibility.

Please be advised that there is the pending issue of the Gulf Stream unit 52-7-A-8250LT-024431 (Ford chassis Vin# 3FCLF53G3VJA02347), damaged by being dropped from a crane, and from waterfowl living in it. This unit we cannot repurchase because it cannot be restored to saleable condition.

Enclosed is a complete detailed accounting of where we stand financially with Bates RV. Your letter, dated April 6, is incorrect in stating that Gulf Stream owes



DEFENDANT'S
F. Bates
EXHIBIT NO. 10
3/2/9     ST

0295

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**BATES SHOW SALES STAFF, INC.**
**d/b/a BATES RVee EXCHANGE, a**
**Florida corporation,**

Plaintiff,                               Case No.   8:00-cv-322-T-27TBM

v.

**GULF STREAM COACH, INC.,**
**a foreign corporation,**

Defendant.

_____/

## AFFIDAVIT OF FRANK BATES

STATE OF FLORIDA

COUNTY OF SARASOTA

Before me, the undersigned authority, FRANK BATES, being first duly sworn deposes and

says:

1.      My name is Frank Bates.  I own Bates Show Sales Staff, Inc. (hereinafter "Bates

RVee") and I possess personal knowledge of the following facts contained in this affidavit. - -

2.      Bates RVee is in the business of selling motor homes and recreational vehicles.  In

the ordinary course of business, Bates RVee will purchase motor homes and recreational vehicles

from their manufacturers, and then resell them to the general public.

3.      In order to finance the purchase of the motor homes and recreational vehicles from

their manufacturers, it is necessary for Bates RVee to enter into business relationships with various

financial institutions for the purpose of establishing a line of credit.  This line of credit is then used

to purchase the motor homes and recreational vehicles from the manufacturers.

4.   The term "floor-plan financiers" is a term of art within the motor home and recreational vehicle industry to describe the financial institutions that provide the credit to retailers (such as Bates RVee) for the purchase of vehicles from the manufacturers. It is critical for a vehicle retailer, such as Bates RVee, to maintain a good credit rating with its floor-plan financiers, as this is the sole method of securing new inventory to sell to the general public.

5.   In 1999, two of the floor-plan financiers that Bates RVee had established a business relationship with for the purpose of providing Bates RVee with credit were NationsBank and Deutsche Financial Services ("DFS"). The business relationship was advantageous to Bates RVee in that it allowed Bates RVee to purchase motor homes and recreational vehicles from numerous manufacturers for the purpose of resale to the general public. The floor-plan financiers retain a security interest in the vehicles each finances.

6.   Prior to February, 1999, Bates RVee had a separate business relationship with Gulf Stream Coach, Inc. (hereinafter "Gulf Stream") who was and is a manufacturer of motor homes and recreational vehicles. Pursuant to its relationship with Gulf Stream, Bates RVee would purchase vehicles from Gulf Stream. At no time was Gulf Stream Bates RVee's sole source of vehicles.

7.   Bates RVee used either DFS or NationsBank as its floor-plan financier for the purchase of vehicles from Gulf Stream. However, Bates RVee's relationship with DFS and NationsBank did not depend on the purchase of vehicles from Gulf Stream, nor did Gulf Stream have any direct input into the nature or scope of Bates RVee's business relationship with its floor-plan financiers. Bates RVee did not need Gulf Stream's approval to enter into or continue with its business relationships with DFS and NationsBank.

8.   In or around February 1999, Bates RVee and Gulf Stream decided to end their business relationship. Once the business relationship between Bates RVee and Gulf Stream ended,

2

Gulf Stream was required to repurchase and take possession of the unsold Gulf Stream-manufactured vehicles in Bates RVee's possession. Essentially, Gulf Stream was simply refunding the purchase money it had received from Bates RVee (via the floor-plan financiers). Gulf Stream was not in any way investing in the floor-plan financiers through this refund of the purchase money.

9. To the best of my knowledge, Gulf Stream was in no way associated with DFS or NationsBank as either a business partner or as a stockholder.

10. Following the severance of Bates RVee's business relationship with Gulf Stream in 1999, Gulf Stream removed the remaining Gulf Stream vehicles from Bates RVee's premises. One of the vehicles manufactured by Gulf Stream, a Sunsport Recreational Vehicle (hereinafter "Sunsport"), was taken to a storage facility. The owner of the storage facility was interested in purchasing the Sunsport, and when he asked Gulf Stream about the possibility of his buying the Sunsport, they instructed him to contact me. Therefore, Gulf Stream knew that the Sunsport was in a saleable condition, and that there was an offer being made on it, following the severance of our business relationship in 1999.

I have read the foregoing affidavit consisting of three typewritten pages and swear that it is true. I certify that I have given this statement voluntarily, without promise of benefit, or threat or coercion of any kind.

FRANK BATES

STATE OF FLORIDA

COUNTY OF SARASOTA

The foregoing instrument was acknowledged before me this 2nd day of April

3

2001, by FRANK BATES, who is personally known to me or who has produced his driver's license

as verification, and who did take an oath.

NOTARY PUBLIC-STATE OF FLORIDA

Signature

Print Name:
Commission No.:
My Commission Expires:



DARCY NEUFELD
MY COMMISSION # CC 940143
EXPIRES: July 21, 2004
Bonded Thru Notary Public Underwriters

4

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BATES SHOW SALES STAFF, INC.,
d/b/a   BATES RVee EXCHANGE,
a Florida corporation,

      Plaintiffs,

v.                             CASE NO.  8:00-CV-322-T-25E

GULF STREAM COACH, INC.,
a foreign corporation,

      Defendant.

_____/

## DEFENDANT'S NOTICE OF PROPOUNDING
## INTERROGATORIES UPON PLAINTIFF

    Defendant, GULF STREAM COACH, INC., through its undersigned attorneys and, pursuant

to Rule 33, Fed.R.Civ.P., hereby serves notice of propounding upon Plaintiff to answer in writing

and under oath Interrogatories numbered 1 through 9 within thirty (30) days from the date of service.

BRUCE W. BENNETT, ESQ.
FBN:  492541
SAM YOUAKIM, ESQ.
FBN: 0984612
HINSHAW & CULBERTSON
100 South Ashley Drive, Suite 830
Tampa, FL 33602
813/276-1662
Fax: 813/276-1956
Attorney for GulfStream Coach, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been delivered via facsimile and U.S. Mail this ____2nd____ day of January 2001, to:

John W. Campbell, Esquire
Constangy Brooks & Smith
Post Office Box 1840
Tampa, FL 33601-1840

SAM M. YOUAKIM, ESQUIRE

## INTERROGATORIES TO PLAINTIFF

1.      What is the name and address of the person answering these interrogatories, and, if applicable, the person's official position or relationship with the party to whom the interrogatories are directed?

ANSWER:

2.      List the names, addresses, telephone numbers, and employer of all persons who you have reason to believe have knowledge relevant to this matter.  Please identify the knowledge which you believe them to have.

ANSWER:

3.     Please list each vehicle which you contend is the subject of this suit, identifying the vehicle and providing its date of purchase by Bates; method of financing; finance/floor-plan company; whether it was ever used at an RV show or marketing event; the date and location of said event; and whether the vehicle was repurchased by Gulf Stream and the date of the repurchase.

ANSWER:

4.     List all damages which you claim, identifying specifically the cause of each item of damages; the amount of each item of damages; the basis for which you believe Gulf Stream is responsible for each items of damages; and the method of calculation for each specific item of damages claimed.

ANSWER:

5.     Please identify each and every communication or act which you contend constitutes Gulf Stream's interference with a contract, including the date of the communication or action; who performed or made the communication or action; to whom the communication or action was directed; the content and nature of the communication or action; with which contract you contend the communication or action improperly interferes; and how the communication or action constitutes interference with a contract.

ANSWER:

6.     Please list the name, last known address, and telephone number of each person you intend to call as a witness in this case.  Also, identify the subject matter about which that witness is to testify.

ANSWER:

7.    With regard to the vehicles which were repurchased by Gulf Stream and are the subject matter of this suit, for the period in which those vehicles were in Plaintiff's possession, please specifically identify by vehicle the location or locations in which they were stored and whether each location was indoors or outdoors; the dates which each vehicle was stored in each location; the number of miles put on each vehicle while in Plaintiff's possession; the dates on which each vehicle was cleaned and/or in any other way maintained; for each cleaning or other maintenance, identify the person or persons who did the cleaning and maintenance on each specific vehicle, including their last known address, telephone number, and employer; and any use made of each vehicle.

ANSWER:

8.    Please state specifically any dates for which any vehicle purchased by Bates from Gulf Stream which is the subject matter of this suit was used for advertisement or display purposes; identify the specific vehicle; whether it was ever suspended in the air by a crane or otherwise and, if so, the dates it was suspended and how it was suspended; whether is was ever dropped or sustained other damage; whether birds or other fowl ever were living in or otherwise damaged the vehicle; the dates on which said damage occurred; the dates on which said damage was discovered; the exact nature of the damage; whether said damage was ever repaired and, if so, who made said repairs, including their names, address and telephone number, the dates of said repairs, the cost of said repairs, and who paid for said repairs.

ANSWER:

9.     Do you contend that you are entitled to DVR credits or payments for any of the vehicles which is the subject matter of this suit? If so, please identify the vehicle, the amount of DVR you claim on that vehicle; the basis of your claim on that vehicle; whether that vehicle was repurchased by Gulf Stream; the reason why you contend you are still entitled to DVR on that vehicle despite the fact that it was repurchased by Gulf Stream; and specifically identify and provide any contractual or other language which you contend supports in any way your claim to entitlement to DVR credit or payment on that vehicle.

ANSWER:

BATES SHOW SALES STAFF, INC. D/B/A BATES RVEE EXCHANGE

By: _____

Its: _____

STATE OF _____

COUNTY OF _____

BEFORE ME, the undersigned authority, personally appeared _____, to me known to be the person described in, and who executed, the foregoing Answers to Interrogatories, and s/he acknowledged before me that the Answers set forth above are true and correct.

SWORN TO AND SUBSCRIBED BEFORE ME this _____ day of _____, 2001, by _____, who is personally known to me or who has produced _____ as identification, and who did/did not take an oath.

_____
Notary Public, State of Florida
My Commission Expires:

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

BATES SHOW SALES STAFF, INC.,
d/b/a  BATES RVee EXCHANGE,
a Florida corporation,

        Plaintiffs,

v.                                  CASE NO.  8:00-CV-322-T-25E

GULF STREAM COACH, INC.,
a foreign corporation,                            *Col/WCR*

        Defendant.

_____/

## DEFENDANT'S REQUEST TO PRODUCE TO PLAINTIFF

      **COMES NOW** the Defendant, **GULF STREAM COACH, INC.,** by and through

undersigned counsel, and respectfully requests the Plaintiff, pursuant to applicable Federal Rules of

Civil Procedure, to produce for inspection and/or copying at the offices of the undersigned within

thirty (30) days, the following:

1.     Please produce every document, including but not limited to contracts, audio and video tapes,

       invoices, memoranda, messages, electronic communications, emails, correspondence,

       invoices, canceled checks, work orders, telephone messages, notes, etc., whether made by

       you, to you, or otherwise which you contend support any allegations of your Complaint.

2.     Please produce every document, including but not limited to contracts, audio and video tapes,

       invoices, memoranda, messages, electronic communications, emails, correspondence,

*Faxed to FB 4/1*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BATES SHOW SALES STAFF, INC.,

          Plaintiff,                      Case No. 8:00-CV-322-T-27TVM

v.

GULF STREAM COACH, INC.,

          Defendant.

_____/

## SECOND AMENDED NOTICE OF TAKING DEPOSITIONS
(Amended as to time only.)

PLEASE TAKE NOTICE that the Defendant, GULF STREAM COACH, INC., by

and through undersigned counsel, will take the depositions of the following persons at the

times and places set forth hereinafter, upon oral examination before a person authorized by

law to take depositions.

| Deponent | Date/Time | Location |
|---|---|---|
| FRANK BATES | March 2, 2001 10:00 a.m. | Sclafani Williams Ct. Reporters 1800 Second Street, Suite 875 Sarasota, Florida 34236 941/954-0020 |
| TIM BECHTOLD | March 9, 2001 10:00 a.m. | Same as above. |

The oral examinations will continue from day to day until completed. These

depositions are being taken pursuant to Rule 30, Federal Rules of Civil Procedure, and for

all purposes as are permitted under the rules of court and all applicable statutes without limitation.

BRUCE W. BENNETT, ESQUIRE
Florida Bar No: 492541
SAM YOUAKIM, ESQUIRE
Florida Bar No: 0984612
HINSHAW & CULBERTSON
100 South Ashley Drive, Suite 830
Tampa, Florida 33602
Telephone 813/276-1662
Facsimile 813/276-1956
Trial Counsel for Gulf Stream Coach, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been delivered by Facsimile and U.S. Mail to **John W. Campbell, Esquire**, Constangy Brooks & Smith, Post Office Box 1840, Tampa, Florida 33601-1840, this _26th_ day of February, 2001.

SAM YOUAKIM, ESQUIRE

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**BATES SHOW SALES STAFF, INC.,**

            Plaintiff,                     Case No. 8:00-CV-322-T-27TVM

v.

**GULF STREAM COACH, INC.,**

            Defendant.

_____/

Cat| WLR

**AMENDED NOTICE OF TAKING DEPOSITIONS**
(Amended as to location only.)

    PLEASE TAKE NOTICE that the Defendant, GULF STREAM COACH, INC., by and through undersigned counsel, will take the depositions of the following persons at the times and places set forth hereinafter, upon oral examination before a person authorized by law to take depositions.

| **Deponent** | **Date/Time** | **Location** |
|---|---|---|
| **FRANK BATES** | March 2, 2001<br>9:00 a.m. | Sclafani Williams Ct. Reporters<br>1800 Second Street, Suite 875<br>Sarasota, Florida 34236<br>941/954-0020 |
| **TIM BECHTOLD** | March 9, 2001<br>9:00 a.m. | Same as above. |

The oral examinations will continue from day to day until completed. These depositions are being taken pursuant to **Rule 30, Federal Rules** of Civil Procedure, and for

all purposes as are permitted under the rules of court and all applicable statutes without limitation.

BRUCE W. BENNETT, ESQUIRE
Florida Bar No: 492541
SAM YOUAKIM, ESQUIRE
Florida Bar No: 0984612
HINSHAW & CULBERTSON
100 South Ashley Drive, Suite 830
Tampa, Florida 33602
Telephone 813/276-1662
Facsimile 813/276-1956
Trial Counsel for Gulf Stream Coach, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been delivered by Facsimile and U.S. Mail to **John W. Campbell, Esquire**, Constangy Brooks & Smith, Post Office Box 1840, Tampa, Florida 33601-1840, this _____ day of February, 2001.

BRUCE W. BENNETT, ESQUIRE

2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BATES SHOW SALES STAFF, INC.,

           Plaintiff,                          Case No. 8:00-CV-322-T-27TVM

v.

GULF STREAM COACH, INC.,

           Defendant.

_____/

## NOTICE OF TAKING DEPOSITIONS

      PLEASE TAKE NOTICE that the Defendant, GULF STREAM COACH, INC., by

and through undersigned counsel, will take the depositions of the following persons at the

times and places set forth hereinafter, upon oral examination before a person authorized by

law to take depositions.

| Deponent | Date/Time | Location |
|---|---|---|
| **FRANK BATES** | March 2, 2001<br>9:00 a.m. | Hartsock & Cervone Ct. Reporters<br>100 N. Tampa Street, Suite 2825<br>Tampa, Florida 33602<br>813/221-3292 |
| **TIM BECHTOLD** | March 9, 2001<br>9:00 a.m. | Same as above. |

      The oral examinations will continue from day to day until completed.  These

depositions are being taken pursuant to Rule 30, Federal Rules of Civil Procedure, and for

all purposes as are permitted under the rules of court and all applicable statutes without limitation.

BRUCE W. BENNETT, ESQUIRE
Florida Bar No: 492541
SAM YOUAKIM, ESQUIRE
Florida Bar No: 0984612
HINSHAW & CULBERTSON
100 South Ashley Drive, Suite 830
Tampa, Florida 33602
Telephone 813/276-1662
Facsimile 813/276-1956
Trial Counsel for Gulf Stream Coach, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been delivered by Facsimile and U.S. Mail to **John W. Campbell, Esquire**, Constangy Brooks & Smith, Post Office Box 1840, Tampa, Florida 33601-1840, this _____ day of February, 2001.

BRUCE W. BENNETT, ESQUIRE

2